AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FEB 0 6 2019

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

One iPhone 6S Plus
IMEI# 353331075815722

Case No. 19MJ0510

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein by reference

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-1, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. § 1324(a)(2)(B)(iii) | Bringing in Aliens Without Presentation |

The application is based on these facts:

See attached Affidavit of Officer Carlo Nazareno, U.S. Customs and Border Protection

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of ____ days (give exact ending date if more than 30 days: ____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Off. Carlo Nazareno, U.S. Customs and Border Protection
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/6/19

*Judge's signature*

City and state: San Diego, CA

Hon. Jill L. Burkhardt, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Carlo E. Nazareno, having been duly sworn, declare and state as follows:

## I

## INTRODUCTION

1. I make this affidavit in support of an application for a warrant to search one iPhone 6S Plus cellular phone, IMEI: 353331075815722 ("Target Device #1") and one iPhone XS Max, IMEI: 357277093867573 (Digital IMEI: 357277094138495) ("Target Device #2") (collectively, "Target Devices"), and seize evidence of crimes, specifically violations of Title 8, United States Code, Section 1324(a)(2)(B)(iii), Bringing in Aliens Without Presentation (the "Target Offenses").

2. Target Device #1 was seized from Defendant Erica Cardenas-Gonzalez ("Defendant #1") at the time of her arrest for the Target Offenses on December 22, 2018, at the Otay Mesa, California Port of Entry. Target Device #2 was seized from Defendant Brenda Flores ("Defendant #2") at the time of her arrest for the Target Offenses on December 22, 2018, at the Otay Mesa, California Port of Entry. The Target Devices are currently in the possession of United States Customs and Border Protection ("CBP") as evidence and being held in CBP custody at 880 Front Street, Suite 6293, Office 13, San Diego, CA 92101.

3. This search of the Target Devices supports an investigation and prosecution of Defendants #1 and #2 for the Target Offenses. Based on the information below, there is probable cause to believe that a search of the Target Devices, as described in Attachments A-1 and A-2, will produce evidence of the Target Offenses, as described in Attachments B-1 and B-2.

4. The following is based upon my experience and training, investigation, and consultation with other law enforcement agents and officers experienced in narcotics and immigration violations, including the Target Offenses. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because I make this affidavit for the limited purpose of

obtaining a search warrant for the Target Devices, it does not contain all of the information known by me or other federal agents regarding this investigation, but only sets forth those facts believed to be necessary to establish probable cause. Dates and times are approximate, and refer to Pacific Standard Time (PST) unless otherwise specified.

## II

## AFFIANT'S EXPERIENCE AND TRAINING

5. I am an Officer with the United States Customs and Border Protection (CBP) within the Department of Homeland Security. I have been a CBP Officer since June 18, 2007 having completed the CBP Officer academy at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. As a result of my training and experience as a CBP Officer, I am familiar with federal criminal and immigration laws. My primary duties have been the enforcement of federal immigration and customs laws. As part of this training, I attended criminal investigation training that included course studies in, among other things, criminal law, constitutional law, search and seizures, and courtroom procedure.

6. As a CBP Officer, I am a Federal Law Enforcement Officer within the meaning of Rule 41(b) of the Federal Rules of Criminal Procedure, that is, a government agent engaged in the enforcement of the criminal laws of the United States, and thereby authorized to request issuance of federal search and seizure warrants. As an Officer with Customs and Border Protection, my responsibilities include the investigation of possible violations of Immigration and Nationality laws (Title 8, United States Code), including alien smuggling in violation of Title 8, United States Code, Section 1324, and related offenses.

7. My assignment includes investigations related to unlawful aliens and alien smuggling. In the course of my duties, I have worked as the case agent, directing specific alien smuggling and illegal entry investigations. I have worked as an officer at the San Ysidro, California Port of Entry (POE), the Otay Mesa, California POE, and Tecate, California POE.

8. During my assignments, I have interviewed defendants and witnesses relative to their illegal entry and alien smuggling. Through my observations and these interviews, I

have gained a working knowledge and insight into the normal operational habits of unlawful aliens and alien smugglers, with particular emphasis on those who attempt to illegally enter or smuggle unlawful aliens into the United States from Mexico.

9. Through the course of my training, investigations, work experience, and conversations with other law enforcement personnel, I am aware that it is a common practice for alien smugglers to work in concert with other individuals, and they do so by utilizing cellular telephones, pagers and portable radios to maintain communications with co-conspirators in order to further their criminal activities. As a part of the San Ysidro Criminal Enforcement Unit (CEU), I have seen numerous telephones being used by load drivers to communicate with smugglers. Typically, load drivers transporting aliens within the United States are in telephonic contact with co-conspirators immediately prior to and following the entry of unlawful aliens into a load vehicle, at which time they receive instructions on where and when to pick up the unlawful aliens and where to deliver them.

10. Based upon my training and experience as a CBP Enforcement Officer, and consultations with law enforcement officers, I submit the following:

   a. Alien smugglers will use cellular telephones because they are mobile and they have instant access to telephone calls, email, Internet, social media applications, and text and voice messages.

   b. Alien smugglers will use cellular telephones because they are able to monitor the progress of their illegal cargo while the conveyance is in transit.

   c. Alien smugglers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations within the United States.

   d. Alien smugglers will use cellular telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

   e. Alien smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity, including the presence and location of marked

and unmarked units, as well as the operational status of Border Patrol checkpoints or Ports of Entry within the United States.

      f.    Alien smugglers will often use cellular phones and smart devices to guide illegal aliens who are crossing into the United States, providing them instructions as to where to go and what to do during a smuggling event. This is often done from over watch positions on high ground in Mexico or at the border fence. This allows smugglers to remotely control the actions of the smuggled aliens, while insulating themselves from criminal prosecution.

      g.    Conspiracies involving alien smuggling often generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel and payment, names, photographs, text messages, and phone numbers of co-conspirators.

11.    Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

12.    Based upon my training and experience as a CBP Enforcement Officer, and consultations with law enforcement officers experienced in smuggling investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones often contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, based upon my training and education, I have learned that searches of cellular/mobile telephones associated with smuggling investigations yield evidence:

4

a. tending to identify attempts to smuggle aliens from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the smuggling of aliens from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the smuggling of aliens from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the smuggling aliens from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, cellular/mobile telephone(s); and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## III

### STATEMENT OF PROBABLE CAUSE

13. On December 22, 2018, at approximately 05:35 hours, Defendant #1 and Defendant #2, both United States citizens, applied for entry into the United States from Mexico through the Otay Mesa, California, Port of Entry (POE) in the vehicle lanes. Defendant #1 was the driver of a white 2015 Toyota Corolla bearing California license plates 7KYP007 ("the Vehicle"). Defendant #2 was the registered owner and passenger of the vehicle.

14. CBP Officer D. Williams was working the primary inspection booth and conducted the primary inspection of Defendants' vehicle. Defendants gave two negative customs declarations to CBP Officer Williams. Upon inspection, CBP Officer Williams

5

discovered two individuals concealed in the trunk of the Vehicle. CBP officers then escorted Defendant to the security office and took the Vehicle to secondary inspection.

15. In the secondary inspection area, CBP officers opened the Vehicle's trunk and removed two males. These males were later identified as (1) Jose Luis Medina-Gomez ("Material Witness #1"), and (2) Qitang Du ("Material Witness #2") (collectively, the "Material Witnesses"). These individuals were determined to be citizens of Mexico and China, respectively, with no legal right to enter or remain in the United States. Officers placed Defendant #1 and Defendant #2 under arrest for violating Title 8, United States Code, Section 1324(a)(2)(B)(iii), Bringing in Aliens Without Presentation.

16. Officers seized the Target Devices incident to Defendants' arrest.[1] After being advised of and waiving her rights under *Miranda*, Defendant #1 identified Target Device #1 as her cellular telephone. Specifically, CBP Officer Adriana Burns provided Target Device #1 to Defendant #1 as Defendant #1's phone for purposes of calling her family to inform them of her arrest. Defendant #1 provided CBP Officer Burns with the valid passcode to access the phone and used it to call her brother. Subsequent to her arrest, Defendant #2 identified Target Device #2 as her cellular phone. Specifically, during routine booking questions, Defendant #2 asked for her cellular phone and for permission to access it to obtain her mother's phone number as a point of contact for CBP. In response,

---

[1] The officers do not recall if the Target Devices were seized from Defendants' person or the Vehicle. On December 22, 2018, CBP officers manually reviewed the contents of the Target Devices at the border. Nothing from the December 22, 2018 manual review is offered to support probable cause in this application. On February 1, 2019, I powered on the Target Devices in airplane mode for the sole purpose of obtaining the Target Devices' IMEI numbers. I did not review the substantive contents of the devices on February 1, 2019, and with the exception of the IMEI numbers, nothing from turning on the devices on February 1, 2019 is offered to support probable cause.

I also declare that nothing from the prior searches of the Target Devices informs my decision to submit this affidavit to obtain a search warrant for the Target Devices. The case is headed to trial and, as we ordinarily do in trial-bound cases, seek to obtain additional evidence to support the charge. I seek this affidavit independent of any information that was seen or reviewed (or not seen) in prior searches.

CBP Officer Burns provided Target Device #2 to Defendant #2, which Defendant #2 accessed and used to obtain her mother's cellular phone. After being advised of and waiving her rights under *Miranda*, Defendant #2 then accessed Target Device #2 with the valid passcode and used it to call her mother and sister to inform them of her arrest.

17. CBP Officer Adriana Burns advised Defendant #1 of her *Miranda* rights and then conducted a post-arrest interview. Defendant #1 stated that she and Defendant #2 have known each other for a little less than one year. Defendant #1 stated that Defendant #2 called her the evening prior and asked her to go to Tijuana to party. Defendant #1 stated that they went to a motel in Tijuana where Defendant #2's male friend ("Subject #1") paid for a motel room for them. Defendant #1 stated that the Vehicle was parked in the motel's gated parking garage.

18. Defendant #1 stated that Defendant #2 told her she previously had smuggled individuals into the United States a few months prior in the Vehicle, drove the individuals to the San Ysidro mall, and was paid $2,000. Defendant #1 also stated that while at a bar in Tijuana the previous night, Defendant #2 asked Defendant #1 whether she was "down" and wanted to smuggle individuals into the United States that night. Defendant #1 said Subject #1 was at the bar and part of the conversation. Defendant #1 initially told Defendant #2 she did not know whether she wanted to go through with it because her dad would be upset if anything happened. Defendant #1 stated that after awhile, she stopped resisting Defendant #2 and went along with it by not saying anything. Defendant #1 stated after returning to the motel, Defendant #2 and Subject #1 left the motel for approximately 30 minutes and returned with tacos. Defendant #1 stated that after eating the tacos, she and Defendant #2 went to the Vehicle, which was in the motel's gated parking garage. Defendant #2 handed Defendant #1 the keys to drive the Vehicle because Defendant #2 felt woozy; Defendant #1 said she thought something might be wrong when Defendant #2 did not want to drive and suspected there may be individuals concealed in the Vehicle, but Defendant #1 still agreed to drive the Vehicle.

19. CBP Officer Burns advised Defendant #2 of her *Miranda* rights and then conducted a post-arrest interview. Defendant #2 waived her *Miranda* rights and denied knowledge of the individuals concealed in the Vehicle's trunk. Defendant #2 admitted to being the registered owner of the Vehicle. Defendant #2 stated that Subject #1 called her the evening prior, invited her to Tijuana to party, and offered to pay for Defendant #2's gas and drinks. Defendant #2 invited Defendant #1 to join.

20. Defendant #2 said after returning to the motel from the bar in Tijuana, she told Subject #1 that she was hungry. Defendant #2 said Subject #1 suggested they take the Vehicle, and Subject #1 drove them to a taco stand. Defendant #2 claims she was asleep the entire time she was in the Vehicle and did not wake up until the two returned to the motel. After spending approximately 15 minutes eating the tacos, Defendant #2 said her and Defendant #1 went upstairs to use the restroom; Defendant #2 stated that she had given the keys to Defendant #1. Defendant #2 claims that when they returned to the Vehicle, she asked Defendant #1 to pop the trunk to get a blanket but Subject #1 told her to take his sweater, which she thought was odd. Another unidentified man then got in the Vehicle and guided Defendants #1 and #2 to the Otay Mesa Port of Entry, exiting the Vehicle before their crossing. Defendant #2 stated that she believes Subject #1 placed the individuals in the Vehicle's trunk.

21. Based on Defendant #1's statement that Defendant #2 had smuggled aliens into the United States a few months prior, I reviewed Defendant #2's crossing history from Mexico to the United States, and her first crossing in 2018 was February 4, 2018.

22. The material witnesses were interviewed at Otay Mesa, California Port of Entry on December 22, 2018. During his interview, Material Witness #1 said he met a man named Juan at a restaurant, and Juan offered him a way into the United States. Material Witness #1 agreed to pay Juan $2,000 if he successfully crossed into San Diego, California. Material Witness #1 further said he saw from his motel room the Vehicle arrive at his motel and identified Defendant #2 as one of the women he saw when the Vehicle arrived. Material Witness #1 did not identify Defendant #1. Early in the morning of December 22,

2018, Material Witness #1 said he was taken from his room to a room in the same motel with a garage. Material Witness #1 was placed in the trunk of the Vehicle with Material Witness #2 and told to remain quiet. Material Witness #1 stated he heard a woman indicate she wanted to get a blanket out of the trunk and a man said she did not need it, leading Material Witness #1 to wonder whether the woman knew he was in the trunk. Material Witness #1 also stated that Material Witness #2 made a telephone call from the trunk.

23. During his interview Material Witness #2 stated he travel from China to Tijuana, Baja California, Mexico in November 2018. He was met by a man at the Tijuana airport and taken to a hostel where he lived for a month until the morning of December 22, 2018 when he was taken to a location, placed in the Vehicle's trunk, then taken to another location where Material Witness #1 was placed inside with him. Material Witness #2 stated he did not see the driver of the Vehicle and that a man gave him a cell phone but he did not use it.

24. On December 24, 2018, a complaint was filed charging Defendant #1 and Defendant #2 with Bringing in Aliens Without Presentation in violation of Title 8, United States Code, Section 1324(a)(2)(B)(iii). Defendants waived Indictment and have been charged by Information with two counts of violating Title 8, United States Code, Section 1324(a)(2)(B)(iii), Bringing in Aliens Without Presentation, and 18 U.S.C. § 2, Aiding and Abetting, in the Southern District of California in case number 19-CR-00245-JM. A motion hearing in this case is set for February 22, 2019 in front of the Honorable Jeffrey T. Miller.

25. Based on my experience investigating alien smugglers, Defendants may have used the Target Devices to coordinate with each other and their co-conspirators regarding the purpose of their travel to Tijuana on December 21, 2018, when they would bring the Material Witnesses to the Vehicle, the location of the Vehicle, and where Defendants would go once the Material Witnesses were in the Vehicle's trunk.

26. Based on my experience and training, consultation with other law enforcement officers experienced in alien smuggling investigations, and all the facts and

opinions set forth in this affidavit, I further believe that information relevant to the alien smuggling activities and her co-conspirators, such as recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, email messages, messages and posts from social networking sites, pictures, and other digital information may be stored in the memory of the Target Devices and may identify other persons involved in alien smuggling activities.

27. Alien smuggling conspiracies require intricate planning and coordination. This often occurs days, weeks, or even months prior to the actual importation of the drugs into the United States. Co-conspirators communicate with one another in efforts to ensure success in getting their valuable cargo to its destination within the United States. Given this, I request permission to search the Target Devices for items listed in Attachments B-1 and B-2 beginning on February 1, 2018, up to and including December 22, 2018. The date range for the search is based on: (1) Defendant #1's statement that she had Defendant #2 knew each other for approximately one year; and (2) Defendant #1's statement that Defendant #2 smuggled aliens previously in 2018 using the Vehicle, and Defendant #2 first crossed her Vehicle from Mexico into the United States in 2018 on February 4, 2018.

### III

### METHODOLOGY

28. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the devices may only be powered in a secure environment or, if possible, started in "flight mode," which disables access to the network.

Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the devices. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

29. Following the issuance of this warrant, I will collect the Target Devices and subject them to analysis. All forensic analysis of the data contained within the Target Devices and their memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

30. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## IV

## CONCLUSION

31. Based on all of the facts and circumstances described above, my training and experience, and consultations with other law enforcement officers, there is probable cause to conclude that Defendants utilized the Target Devices to facilitate the smuggling of unlawful aliens in violation of Title 8, United States Code, Section 1324.

32. Because the Target Devices were promptly seized during the investigation of Defendant's smuggling activities and have been securely stored, there is probable cause to believe that evidence of illegal activities committed by Defendant continues to exist on the

Target Devices. As stated above, the date range for this search is from February 1, 2018 through December 22, 2018.

33. Based upon my experience and training, consultation with other agents in narcotics investigations, consultation with other sources of information, and the facts set forth herein, I believe that the items to be seized set forth in Attachments B-1 and B-2 (incorporated herein) are likely to be found in the property to be searched described in Attachment A-1 and A-2 (incorporated herein). Therefore, I respectfully request that the Court issue a warrant authorizing me, or another federal law enforcement agent specially trained in digital evidence recovery, to search the items described in Attachments A-1 and A-2, and seize the items listed in Attachments B-1 and B-2.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Carlo Nazareno
Enforcement Officer
Customs and Border Protection

Sworn to and subscribed before me this ___6th___ day of February, 2019.

_____
HON. JILL L. BURKHARDT
UNITED STATES MAGISTRATE JUDGE

12

# **ATTACHMENT A-1**

## PROPERTY TO BE SEARCHED

The property to be searched in connection with an investigation of violation of Title 8, United States Code, Section 1324(a)(2)(B)(iii), Bringing in Aliens Without Presentation, is an iPhone 6s Plus cellular phone, IMEI: 353331075815722 (the "Target Device #1").

The Target Device is currently in the possession of the United States Customs and Border Protection as evidence and being held at 880 Front Street, Suite 6293, Office 13, San Diego, CA 92101.

## **ATTACHMENT B-1**

Authorization to search Target Device #1 described in Attachment A-1 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Target Device #1 for evidence described below. The seizure and search of the Target Device #1 shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats, and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of February 1, 2018 to December 22, 2018:

    a.    tending to identify attempts to smuggle aliens from Mexico into the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the smuggling of aliens from Mexico into the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in the smuggling of aliens from Mexico into the United States;

    d.    tending to identify travel to or presence at locations involved in the smuggling aliens from Mexico into the United States, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, cellular/mobile telephone(s); and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

which are evidence of violations of Title 8, United States Code, Section 1324(a)(2)(B)(iii), Bringing in Aliens Without Presentation.